UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

GLORENA B. CONSEDINE,                      *
                                           *
        Plaintiff,                         *
                                           *
        v.                                 *
                                           *        Civil Action No. 13-30193-MGM
WILLIMANSETT EAST SNF,                      *
                                           *
        Defendant.                         *

MEMORANDUM AND ORDER REGARDING
DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT
(Dkt. No. 42)

September 30, 2016

MASTROIANNI, U.S.D.J.

## I.      INTRODUCTION

Glorena B. Consedine ("Plaintiff") brings this employment discrimination action against

Willimansett East SNF ("Willimansett East" or "Defendant"), her former employer. Plaintiff asserts

claims for disability discrimination (Counts I and VI), failure to accommodate (Counts II and VII),

and retaliation (Counts III and VIII) in violation of the Americans with Disabilities Act, 42 U.S.C. §

12101 et seq. ("ADA") and Mass. Gen. Laws ch. 151B, as well as interference (Count IV) and

retaliation (Count V) in violation of the Family Medical Leave Act, 29 U.S.C. § 2611 et seq.

("FMLA"). Presently before the court is Defendant's motion for summary judgment as to all counts.

For the reasons which follow, the court will deny Defendant's motion.

## II.      BACKGROUND

The following facts, which are construed in a light most favorable to Plaintiff, are not

disputed, except as otherwise noted. Willimansett East is a long term care facility located in

Chicopee, Massachusetts. (Dkt. No. 44, Def.'s Statement of Material Facts ("Def.'s SOF") ¶ 1.) On April 4, 2011, Plaintiff was hired as the Admissions Director at Williamansett Center West ("Williamansett West"), the sister facility of Williamansett East. (*Id.* ¶ 2.)[1] On May 20, 2011, Plaintiff was transferred to Williamansett East into the position of Admissions and Business Development Director.  (*Id.* ¶ 3.) This position required her to conduct at least two or three, and up to ten, tours of the facility per week. (*Id.* ¶ 7.)[2] The tours generally lasted between thirty and forty-five minutes each, but they could also take longer than an hour. (*Id.* ¶ 7.)

On May 19, 2012, Plaintiff fell off a ladder outside of work and sustained a tibia fibula plateau fracture of her right leg. (Def.'s SOF ¶ 11.) Her injury required surgery, which entailed the insertion of a bone graft and hardware, to repair the bones and her right knee joint. (*Id.* ¶ 13; Pl.'s SOF ¶ 70.) On May 21, 2012, Plaintiff reported her injury and anticipated extended absence to the Administrator of Williamansett West, and later she explained her situation to James Lomastro, the Administrator of Williamansett East. (Def.'s SOF ¶ 14.) Her surgery occurred on May 25, 2012. (*Id.* ¶ 15.) Plaintiff's physician, Dr. Bennett Burns, explained that the surgery disrupted the daily life activities of standing, bathing, and driving, among others. (Pl.'s SOF ¶ 70.) On June 7, 2012, Plaintiff requested leave under the FMLA from May 21, 2012 through August 21, 2012 to recuperate from the surgery. (Def.'s SOF ¶ 16.) Defendant granted Plaintiff's request on June 11, 2012, and Plaintiff received the full twelve weeks of leave to which she was entitled under the FMLA. (*Id.* ¶¶ 17, 29.)

---

[1] The two facilities are located across the street from each other.  (Dkt. No. 59, Pl.'s Responses and Additions to Def.'s Statement of Material Facts ("Pl.'s SOF") ¶ 67.)

[2] The parties dispute whether Plaintiff's position also required her to travel outside of the facilities. (Def.'s SOF ¶ 5; Pl.'s SOF ¶¶ 64-66.) Plaintiff testified in her deposition and stated in an affidavit that her position only consisted of "inside" admissions and that Defendant employed others to perform "outside" admissions tasks requiring travel outside of the facility. (Dkt. No. 45, Ex. C at 43; Dkt. No. 52, Ex. EE ¶¶ 6-8.) Moreover, while Defendant submitted a written job description for the position signed by Plaintiff which listed "[m]akes sales calls outside the facility," Plaintiff has submitted a copy of the job description containing the handwritten notation "acknowledged receipt of only" next to her signature. (Dkt. No. 45, Ex. F; Dkt. No. 52, Ex. BB.) This notation appears to have been redacted from Defendant's submission. (Dkt. No. 45, Ex. F.)

On August 9, 2012, during a post-operation appointment, Dr. Burns released Plaintiff to return to work with certain restrictions contained in a work modification note. (Pl.'s SOF ¶ 74; Dkt. No. 45, Ex. N.) The restrictions, which Dr. Burns noted should remain in effect for four weeks or until Plaintiff was seen again, included walking with a crutch or cane, limited distance and duration of walking, not lifting over ten pounds, and sedentary work. (*Id.* ¶ 75; Dkt. No. 45, Ex. N.) Dr. Burns also noted that Plaintiff "[s]hould start with part time work" for the first two to four weeks. (*Id.*) At the bottom of the note, Dr. Burns wrote: "If these restrictions cannot be accommodated, then patient is on 'no duty' status for the same time period." (Dkt. No. 45, Ex. N.) In a separate note, Dr. Burns stated Plaintiff "usually has to do a fair amount of running to get data and paperwork" at her job, but "[i]f they accommodate by bringing paperwork to her, I think it would be reasonable for her to go back to work in a sedentary fashion at any time." (Dkt. No. 45, Ex. I.)[3]

After Plaintiff tried calling Lomastro and left a copy of the work modification note on his desk, Lomastro contacted Plaintiff on August 17, 2012. (Pl.'s SOF ¶¶ 76-77.) Plaintiff asserts Lomastro told her she could only return to work when she was "100 percent" and did not have any restrictions or require any accommodations. (Pl.'s SOF ¶ 77.)[4] On August 20, 2012, Plaintiff sent Lomastro an email asking for a copy of the "Corporate Policy" he had mentioned which prohibits part-time work. (Dkt. No. 45, Ex. O.) Plaintiff also asked if there was "any way Corporate can permit a variation of this policy per ADA employee 'reasonable accommodation' clauses(s)," "[s]o I

---

[3] In his deposition, Dr. Burns explained this description of Plaintiff's work came from Plaintiff, because "despite the regulation saying they're supposed to provide it for us, we almost never get a job description from the employer." (Dkt. No. 45, Ex. H at 30-31.) Moreover, Dr. Burns believed the description indicated "a fair amount of distance and mobility from place to place, not that she had to physically sprint." (*Id.* at 110-111.) He also assumed Plaintiff could walk to do those tasks. (*Id.* at 112.)

[4] Defendant disputes this assertion, contending Lomastro only stated Plaintiff "had to return without any restriction that would interfere with her performing all the essential functions of her job." (Dkt. No. 59, Def.'s Response to Pl.'s Statement of Material Facts ("Def.'s Response SOF") ¶ 77.) However, Lomastro testified during his deposition that he thought he told Plaintiff she could only return "without restrictions." (Dkt. No. 45, Ex. A at 51, 56.)

can get back to work on 8/27/12, at least part time." (*Id.*)[5] Plaintiff further stated she could "get around in my wheel chair." (*Id.*)

On August 23, 2012, Lomastro sent Plaintiff a letter stating that her medical leave had expired on August 21, 2013, and "[r]eturn to work is predicated on a fitness for duty certificate without restriction and full time." (Dkt. No. 45, Ex. P.) Lomastro further stated he had not heard "the date that you will return to work full time" and Plaintiff was "welcome to apply for any future openings that occur." (*Id.*) He requested Plaintiff contact him regarding her intentions by August 29, 2012 and stated "[f]ailure to return will result in a voluntary resignation." (*Id.*) On August 29, 2012, Plaintiff and Lomastro met to discuss Plaintiff's return to work. (Pl.'s SOF ¶ 81.) Lomastro told Plaintiff she could not return until she had "no restrictions" and was "100 percent" in accordance with "corporate policy." (*Id.*; Dkt. No. 45, Ex. C at 75, Ex. A at 85.)

On August 30, 2012, Plaintiff filed a Charge of Discrimination with the Massachusetts Commission Against Discrimination ("MCAD") alleging Defendant had discriminated against her based upon her disability and failed to provide her with reasonable accommodations. (Pl.'s SOF ¶ 82.)[6] That same day, Lomastro sent Plaintiff an email informing her that she would be placed on a personal medical leave of absence ("PMLA") effective August 29, 2012 through September 10, 2012. (*Id.* ¶ 83; Dkt. No. 45, Ex. Q.) Lomastro further stated:

> If you are not released to full duty at that time, a decision will be made to terminate the leave. On PMLA, your job is not guaranteed, when you come off the leave. If no one is hired and you are released to full duty, you will be placed back into a job. If a replacement has been hired prior to your returning to work, we will make every effort to find a position for you. If there is not one available, your employment will be terminated. Please know we will make every attempt to find you a position.

---

[5] Defendant asserts the essential functions of Plaintiff's position could not be completed by an individual on a part-time schedule; however, Plaintiff points out that, while she was out on leave, her position was filled only part-time. (Def.'s SOF ¶ 26; Pl.'s SOF ¶ 26; Dkt. No. 45, Ex. G at 39-41.)

[6] Defendant apparently received notice of the MCAD Charge, by way of a letter dated September 5, 2012, on September 12, 2012. (Def.'s Response SOF ¶ 84; Dkt. No. 59, Ex. HH.)

(Dkt. No. 45, Ex. Q.)

On September 10, 2012, Plaintiff was re-evaluated by Dr. Burns and received clearance to work full-time with restrictions. (Pl.'s SOF ¶ 85; Dkt. No. 45, Ex. S.) The restrictions included: "no lifting greater than 30 lbs," "limit pulling/pushing to 50 lbs," "may limit duration of walking (15 min at a time with breaks in between)," "may use cane," and "starting driving." (Dkt. No. 45, Ex. S.) These restrictions were to remain in effect for four to six weeks or until Dr. Burns saw Plaintiff again. (*Id.*) After Plaintiff provided this work modification note to Lomastro, he told her that she still had to come back "100 percent" with "no restrictions." (Pl.'s SOF ¶ 85; Dkt. No. 45, Ex. C at 82.) Lomastro also stated Plaintiff had to be able to lift sixty pounds. (*Id.*) Plaintiff then emailed Lomastro and Richard Parker, the Director of Human Resources for Airamid (a company that provides consulting services to Defendant), questioning the sixty-pound-lifting requirement and requesting to return to work with the restrictions noted in the work modification note. (Def.'s SOF ¶ 38; Dkt. No. 45, Ex. T.) On September 11, 2012, Parker wrote in an email that he "agree[d] that a 60-pound lifting restriction is arbitrary and unnecessary for this job." (Dkt. No. 45, Ex. T.) "[H]owever," he continued:

> I'm not sure we can make reasonable accommodations for the restrictions provided by her physician. I assume the essential functions of her job is to conduct tours. In the restrictions from her physician she is restricted to walking 15 minutes with breaks. I don't see how we can have her conduct tours with that restriction.

(Dkt. No. 45, Ex. T.)

On September 12, 2012, Plaintiff replied with another email stating her procedure for giving tours "has always allowed me moments to stop/pause to point out our features and benefits, as well as introduce the [prospective] client/family to our professional staff, which most often results in the department head taking the lead to explain his or her department['s] advantages in the care of their loved one." (*Id.*) Plaintiff therefore asserts, consistent with her email, that the fifteen-minute-break restriction would not have interfered with her ability to conduct the tours, because "[t]ouring

patients and their families would never have had to wait for [her] to rest before she resumed the tour since there were plenty of opportunities for her to rest [and/or sit down] during the course of the tour." (Pl.'s SOF ¶¶ 88-89.)[7] Moreover, no one at Willimanset East ever told Plaintiff's replacement that she could not sit down while giving a tour. (Pl.'s SOF ¶ 90.) Plaintiff requested, in the alternative, to conduct tours in a wheelchair, but this request was also denied by Defendant. (*Id.* ¶ 91; Dkt. No. 52, Ex. EE ¶ 13.) However, many residents used wheelchairs in the facility, and no one ever indicated to Plaintiff that giving a tour in a wheelchair would create any safety hazard. (Pl.'s SOF ¶ 92.)

Plaintiff asserts that on September 11, 2012, during a conversation with Parker, he informed her that her PMLA was going to be extended beyond September 10, 2012. (*Id.* ¶ 93.)[8] On September 18, 2012, however, Lomastro terminated Plaintiff's employment. (Def.'s SOF ¶ 44; Pl.'s SOF ¶ 94.) By mid-October of 2012, Plaintiff no longer had walking restrictions which would have required her to rest while giving tours. (Pl.'s SOF ¶ 95.) In late October or early November of 2012, Lomastro hired Michaela Cassidy, who had been filling in during Plaintiff's absence, for the Admissions and Business Development position. (*Id.* ¶ 96.) By December 28, 2012, Plaintiff no longer was using a cane but carried it with her just in case. (Pl.'s SOF ¶ 48.)

### III. STANDARD OF REVIEW

At the summary judgment stage, the court must view the facts in the light most favorable to the non-moving party "and draw all reasonable inferences in its favor." *CNE Direct, Inc. v. Blackberry Corp.*, 821 F.3d 146, 148 (1st Cir. 2016). "Summary judgment is permissible only when examination

---

[7] Defendant purports to dispute Plaintiff's description of a "typical tour," asserting it "directly contradicts [her] deposition testimony." (Def.'s Response SOF ¶ 88.) Defendant is incorrect; the deposition testimony cited by Defendant is consistent with the description above, noting numerous opportunities to sit during the course of a tour. (Dkt. No. 45, Ex. C at 36-39.)

[8] Defendant disputes this assertion. (Def.'s Response SOF ¶ 93.)

of the record in that light reveals 'no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law.'" *Flovac, Inc. v. Airvac, Inc.*, 817 F.3d 849, 853 (1st Cir. 2016)

(quoting Fed. R. Civ. P. 56(a)). "'A dispute is genuine if the evidence about the fact is such that a

reasonable jury could resolve the point in the favor of the non-moving party. . . . A fact is material if

it has the potential of determining the outcome of the litigation.'" *Patco Const. Co. v. People's United*

*Bank,* 684 F.3d 197, 206–07 (1st Cir. 2012) (quoting *Rodriguez-Rivera v. Federico Trilla Reg'l Hosp. of*

*Carolina*, 532 F.3d 28, 30 (1st Cir. 2008)).

IV. DISCUSSION

A.    Disability Claims (Counts I, II, III, VI, VII, and VIII)

The ADA and Mass. Gen. Laws ch. 151B make it unlawful for an employer to discriminate

against a qualified individual on the basis of disability,[9] including by failing to provide a reasonable

accommodation. *See* 42 U.S.C. § 12112(a), (b)(5)(A); Mass. Gen. Laws ch. 151B § 4(16); *Flanagan-*

*Uusitalo v. D.T. Indus., Inc.*, 190 F. Supp. 2d 105, 115 (D. Mass. 2001). To establish a prima facie claim

of disability discrimination, "[o]rdinarily, the plaintiff must show that [s]he (1) is disabled within the

meaning of the ADA; (2) is qualified to perform the essential function of h[er] job with or without a

reasonable accommodation; and (3) was discharged or otherwise adversely affected in whole or in

part because of h[er] disability." *Jones v. Nationwide Ins. Co*, 696 F.3d 78, 86 -87 (1st Cir. 2012).[10]

Moreover, the ADA and Chapter 151B proscribe retaliation for engaging in protected activity,

including requesting a reasonable accommodation. *See* 42 U.S.C. § 12203(a); Mass. Gen. Laws ch.

151B § 4(4); *Murray v. Warren Pumps, LLC*, 821 F.3d 77, 87 (1st Cir. 2016). "To establish a prima

---

[9] Chapter 151B uses the term "handicap," rather than disability. Mass. Gen. Laws ch. 151B § 4(16). Nevertheless, as recognized by the First Circuit, "Chapter 151B 'tracks the ADA in virtually all respects.'" *Tobin v. Liberty Mut. Ins. Co.*, 553 F.3d 121, 125 n.3 (1st Cir. 2009) (quoting *Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 20 n.5 (1st Cir. 2002)). The court, therefore, will primarily focus on the ADA and federal case law. *See id.*
[10] "Where a plaintiff alleges a failure to accommodate, the plaintiff must show that the employer knew about the plaintiff's disability and did not reasonably accommodate it." *Id.* at 89.

facie claim of retaliation, [the plaintiff] must show 'that [s]he was engaged in protected conduct, that [s]he was discharged, and that there was a causal connection between the discharge and the conduct.'" *Wright v. CompUSA, Inc.*, 352 F.3d 472, 478 (1st Cir. 2003) (quoting *Soileau v. Guilford of Maine, Inc.*, 105 F.3d 12, 16 (1st Cir. 1997)).

Defendant argues it is entitled to summary judgment on Plaintiff's disability claims because Plaintiff was not disabled, Defendant provided Plaintiff a reasonable accommodation, Plaintiff could not perform the essential functions of her job even with a reasonable accommodation as of September 10, 2012, and Plaintiff has not provided sufficient evidence that she was retaliated against for requesting an accommodation. The court addresses each argument in turn.

     1.   <u>Whether Plaintiff's Impairments Rose to a Disability</u>

Under the ADA, "disability" is defined as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having an impairment." 42 U.S.C. § 12102(1); *see also* Mass. Gen. Laws ch. 151B § 1(17). The statute also states "major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).

Defendant asserts Plaintiff's impairment did not rise to the level of a disability because they were temporary in nature and by September 10, 2012, did not substantially limit a major life activity. As Plaintiff argues, however, Defendant ignores the ADA Amendments Act of 2008, which sought to override the demanding disability standard enunciated by the Supreme Court in *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002), *see Summers v. Altarum Institute, Corp.*, 740 F.3d 325, 329 (4th Cir. 2014), and "commands courts to construe the definition of disability in favor of broad coverage, 42 U.S.C. § 121202(4)(A), and to focus on an employer's actions rather than the extent of

an employee's disability." *Williams v. Kennedy*, 38 F. Supp. 3d 186, 193 (D. Mass. 2014). "In essence,

Congress wanted courts to temper their scrutiny when considering the impact an individual's

impairments have on his or her ability to undertake major life activities." *Id.*; *see also Gil v. Vortex*, 697

F. Supp. 2d 234, 240 (D. Mass. 2010) ("The court is also confident that the Supreme Judicial Court .

. . would apply the same revised standard in interpreting the term [handicap] for purposes of

Chapter 151B." (citing *Dahill v. Police Dep't of Boston*, 748 N.E.2d 956 (Mass. 2001))).[11] Even as of

September 10, 2012, Plaintiff continued to have significant limitations in the major life activities of

walking and lifting, among others. Plaintiff has presented sufficient evidence from which a jury

could find she was disabled.

 2. Qualified Individual and Reasonable Accommodations

 "The 'qualified individual' criterion and the 'reasonable accommodation' requirement are

interrelated." *Jones*, 696 F.3d at 88 (quoting H. Perritt, Jr., *Americans with Disabilities Act Handbook* §

4.18, at 124 (3d ed. 1997)). An employee is considered "qualified" first, if "she had the necessary

'skill, experience, education, and other job-related requirements' for the . . . position and, second, [if]

she was able to perform the 'essential functions' of the positon 'with or without reasonable

accommodation.'" *Richardson v. Friendly Ice Cream Corp.*, 594 F.3d 69, 75 (1st Cir. 2010) (quoting

*Mulloy Acushnet Co.*, 460 F.3d 141, 147 (1st Cir. 2006)). "Reasonable accommodations are

modifications or adjustments to the work environment, or to the manner in which the position's

duties are customarily performed, that enable a qualified individual with a disability to perform the

essential functions of that position." *Murray*, 821 F.3d at 84. "An essential function is a 'fundamental

job duty of the position at issue. The term does not include marginal tasks, but may encompass

---

[11] Moreover, Defendant cites 42 U.S.C. § 12102(3)(B) as requiring the impairment to last at least six months, but that provision only applies to "regarded-as" disabilities, and the statute "imposes no such durational requirement for 'actual' disabilities." *Summers*, 740 F.3d at 332; *see also* 29 C.F.R. § 1630.2(j)(1)(ix). As Plaintiff has only argued "actual disability" in opposition to Defendant's summary judgment motion, the court does not consider whether she could be found to be "regarded-as" disabled.

individual or idiosyncratic characteristics of the job.'" *Jones*, 696 F.3d at 88 (quoting *Kvorjak v. Maine*,

259 F.3d 48, 55 (1st Cir. 2001)).

Defendant argues that it provided Plaintiff a reasonable accommodation by allowing her to

take a PMLA and that at the end of Plaintiff's PMLA, there was no accommodation which would

have permitted her to perform all the essential functions of her job. Even assuming Plaintiff's

PMLA constituted a reasonable accommodation, Plaintiff has sufficiently demonstrated she could

perform the essential functions of her position by September 10, 2012 with reasonable

accommodations, and that Defendant failed to provide her a reasonable accommodation, despite

repeated requests to do so. In particular, Plaintiff's evidence demonstrates she could have given the

tours required of her position even with her doctor's restrictions, with minimal or no interruption.

That is, her tours, even before her injury, provided ample opportunity for her to rest or sit at various

intervals. Plaintiff also presented evidence that she offered to provide the tours in a wheelchair and

that many patients at the facility used wheelchairs to get around, thereby indicating there was no

safety hazard. While Defendant takes issue with these assertions, such disputes of material fact will

ultimately have to be resolved by a jury. And, on these facts, a jury could find Plaintiff was qualified

to perform the essential functions of her job with a reasonable accommodation and was discharged,

at least in part, because of a disability.

A jury could also find Plaintiff requested, and Defendant failed to provide, a reasonable

accommodation. Although Parker ultimately agreed with Plaintiff that a sixty-pound lifting

requirement was unnecessary,[12] Lomastro repeatedly stated Plaintiff could not return to work until

she had "no restrictions" and was "100 percent." Such statements—essentially a refusal to provide

---

[12] Lomastro only mentioned this requirement for the first time on September 10, 2012.

any accommodations or engage in the "interactive process"[13]—could certainly be found to violate of the ADA's reasonable accommodation requirement.

Accordingly, the court will deny Defendant's motion for summary judgment as to Plaintiff's claims for disability discrimination (Counts I and VI) and failure to accommodate (Counts II and VII).[14]

### 3.   Disability Retaliation

Defendant also argues Plaintiff has not demonstrated it retaliated against her for requesting an accommodation because there is no causal connection between her protected activity and her termination. Again, the court does not agree.

First, the temporal proximity between Plaintiff's request for an accommodation and her termination was "very close." *Murray*, 821 F.3d at 88 (quoting *Ahern v. Shinseki*, 629 F.3d 49, 58 (1st Cir. 2010)). She requested accommodations on September 12, 2012, and she was terminated less than a week later, on September 18, 2012. Second, Plaintiff has also presented evidence that Parker stated her PMLA would be extended beyond September 10, 2012, and that when she learned of her termination, she was "caught by surprise." (Dkt. No. 52, Ex. GG; Dkt. No. 45, Ex. C at 89-90.) Third, as discussed, whenever Plaintiff asked Lomastro for an accommodation, he replied that she could only return with "no restrictions" and when she was "100 percent." A jury could interpret

---

[13] "[A]n employee's request for accommodation sometimes creates 'a duty on the part of the employer to engage in an interactive process.'" *Equal Employment Opportunity Comm'n v. Kohl's Dep't Stores, Inc.*, 774 F.3d 127, 132 (1st Cir. 2014) (quoting *Enica v. Principi*, 544 F.3d 328, 338 (1st Cir. 2008)). "The interactive process involves an informal dialogue between the employee and the employer in which the two parties discuss the issue affecting the employee and potential reasonable accommodations that might address those issues." *Id.*

[14] Although Defendant also argues Plaintiff has not sufficiently demonstrated, under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-805 (1973), that its non-discriminatory reason for terminating Plaintiff was merely a pretext, the court disagrees. Plaintiff's evidence creates a genuine dispute as to whether Defendant legitimately fired her for her purported inability to perform the essential functions of her job or, instead, used that justification to mask its discriminatory animus. *See Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 167 (1st Cir. 1998) ("[W]here a plaintiff in a discrimination case makes out a prima facie case and the issue becomes whether the employer's stated nondiscriminatory reason is pretext for discrimination, courts must be 'particularly cautious' about granting the employer's motion for summary judgment." (quoting *Stepanischen v. Merchants Despatch Transp. Corp.*, 722 F.3d 922, 928 (1st Cir. 1983)).

these statements as indicating that Lomastro harbored retaliatory animus against Plaintiff for requesting accommodations. *See Perez-Cordero v. Wal-Mart Puerto Rico, Inc.*, 656 F.3d 19, 32 (1st Cir. 2011) (stating that when "the evidence can reasonably be viewed as demonstrating either discriminatory animus or retaliatory animus, [courts] may consider the same evidence in assessing the sufficiency of both of the plaintiff's claims"). Accordingly, the court will deny Defendant's motion for summary judgment as to Plaintiff's claims for disability retaliation ((Counts III and VIII).[15]

B.    FMLA Claims (Counts IV and V)

The FMLA entitles eligible employees to twelve weeks of leave during a twelve-month period for "serious health condition[s] that make[] the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). "[O]n return from such leave," eligible employees are entitled "(A) to be restored by the employer to the position of employment held by the employee when the leave commenced; or (B) to be restored to an equivalent position with equivalent benefits, pay, and other terms and conditions of employment." 29 U.S.C. § 2614(a)(1). However, "[i]f the employee is unable to perform an essential function of the position because of a physical or mental condition . . . the employee has no right to restoration to another position under the FMLA." 29 C.F.R. § 825.216(c).

"The FMLA provides a right of action for employees to recover based on an employer's interference with rights guaranteed by the act or for retaliation by employers against employees who exercise their FMLA rights." *Roman v. Potter*, 604 F.3d 34, 43 (1st Cir. 2010). Unlike an interference claim, in which the intent of the employer is irrelevant, a retaliation claim requires the employee to demonstrate that the employer subjected the employee to an adverse employment action *because of*

---

[15] Again, Plaintiff's evidence also suffices to demonstrate pretext at the third step of the *McDonnell Douglas* burden-shifting framework.

the employee's exercise of his or her FMLA rights. *See Colburn v. Parker Hannifin/Nichols Portland Div.*, 429 F.3d 325, 332 (1st Cir. 2005). Similar to an ADA retaliation claim, to establish a prima facie FMLA retaliation claim, a plaintiff must show "1) [she] had availed herself of a protected right under the FMLA; 2) [she] was adversely affected by an employment decision; and 3) there was a causal connection between the protected conduct and the adverse employment action." *Orta-Castro v. Merck, Sharp & Dohme Quimica P.R., Inc.*, 447 F.3d 105, 113-114 (1st Cir. 2006).

      1.   <u>Interference Claim</u>

      Defendant argues Plaintiff's interference claim fails because she received the full amount of FMLA leave and, at the end of the twelve weeks, she was unable to return to her job on a full-time basis or perform the essential functions of her job. The court does not agree.

      It is true that Plaintiff received the full twelve weeks of FMLA leave to which she was entitled. In addition, the court recognizes that "unlike the ADA, the FMLA does not contain a reasonable accommodation element." *Jewell v. Reid's Confectionary Co.*, 172 F. Supp. 2d 212, 220 (D. Me. 2001) (citing *Tardie v. Rehabilitation Hosp. of Rhode Island*, 168 F.3d 538, 544 (1st Cir. 1999)). However, Plaintiff disputes whether working full-time was an essential function of her job. (Pl.'s SOF ¶ 26.) Moreover, although Dr. Burns stated in his August 9, 2012 work modification note that Plaintiff "[s]hould start with part time work" for the first two to four weeks, Plaintiff's FMLA leave did not expire until August 21, 2012, which was approximately two weeks later. (Dkt. No. 45, Ex. N.) And in Plaintiff's August 20, 2012 email, she asked to come back to work "at least part time" and stated she could "get around in [her] wheel chair." (Dkt. No. 45, Ex. O.) It is not clear whether Plaintiff was required, as an essential function of her job, to walk while giving the tours, rather than use a wheelchair. The same is true regarding the "running to get data and paperwork," described in Dr. Burn's separate August 9, 2012 note. (Dkt. No. 45, I.) Given these facts, although a close

question, a jury could find Defendant interfered with Plaintiff's FMLA rights by failing to restore her to her position, or an equivalent one, at the conclusion of her FMLA leave.

      2.      <u>Retaliation Claim</u>

      Lastly, Defendant argues Plaintiff has not demonstrated a causal connection between her protected activity (requesting and receiving FMLA leave) and an adverse employment action. The court concludes that she has.

      As an initial matter, contrary to Defendant's assertion, adverse employment actions are not limited merely to an employee's termination. Rather, under *Burlington Northern & Sante Fe Railway Co. v. White*, 548 U.S. 53, 68 (2006), they are actions "a reasonable employee would [find to be] materially adverse" in the sense that they would dissuade the employee from taking FMLA leave. *Bellone v. Southwich-Tolland Regional School Dist.*, 915 F. Supp. 2d 187, 199 (D. Mass. 2013) (collecting cases which apply *Burlington Northern*'s "adverse employment action" standard to the FMLA context). Thus, as Plaintiff argues, the adverse employment actions here include Defendant's denials of her reasonable requests for accommodations, in addition to her ultimate termination. Those denials began while Plaintiff was still on FMLA leave and continued until shortly after the leave ended. As such, the temporal proximity between the protected conduct and adverse employment actions was close. *See DeCaire v. Mukasey*, 530 F.3d 1, 19 (1st Cir. 2008) ("[O]ur law is that temporal proximity alone can suffice to 'meet the relatively light burden of establishing a prima facie case of retaliation.'" (quoting *Mariani-Colon v. Dep't of Homeland Sec. ex. rel. Chertoff*, 511 F.3d 216, 224 (1st Cir. 2007)). In the end, although the evidence may support a stronger inference that Defendant retaliated against Plaintiff for requesting accommodations, the court concludes a jury could also infer retaliation for taking FMLA leave.[16]

---

[16] Defendant has not argued Plaintiff's FMLA retaliation claim fails at the third step of the *McDonnell Douglas* burden-shifting framework.

V.    CONCLUSION

For these reasons, the court DENIES Defendant's motion for summary judgment. (Dkt.

No. 42).

It is So Ordered.


       /s/ Mark G. Mastroianni
       MARK G. MASTROIANNI
       United States District Judge